# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2273

_____

Rodney P. Fischer,

              Appellant,

v.

Andersen Corporation,

              Appellee.

\*   Appeal from the United States
\*   District Court for the
\*   District of Minnesota.

_____

Submitted: December 13, 2006
     Filed: April 13, 2007 (Corrected: 05/02/2007)

_____

Before WOLLMAN, RILEY, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Rodney Fischer appeals from the district court's[1] summary judgment in favor of his employer, Andersen Corporation ("Andersen"), on his claim that Andersen, with the intention of interfering with his rights to future pension benefits, forced him to take early retirement in violation of section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140. We affirm.

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

I.

Fischer joined Andersen in 1971 to work at its door production facility. From early 1990 until his retirement in 2003, he served in an engineer support role. While he had consistently received satisfactory job performance reviews through 2002, notes in a May 21, 2001, review point out that Fischer was uncomfortable with assignments that required quick responses and that he had difficulties with coordination, implementation, and follow-up projects. They also specified, among other things, that his communication skills were **an area in which improvements were "most desirable."**

In early 2002, the plant had not been satisfying its customers, and the door plant engineers had a poor record of delivering projects on time and on budget. Andersen appointed Mike Midby to the position of engineering manager for Andersen's door plant, with instructions to improve the skills and overall performance of the engineering team. Fischer contends, though, that "the rumor was that Mike Midby was coming . . . to start forcing out older engineers."

Midby repeatedly told the entire department that he had higher performance expectations than did his predecessors and that he was "raising the bar." In the summer of 2002, Midby told Fischer that if he wanted to remain in his then-current employment classification category of "Engineer I," he would have to begin taking direct responsibility for projects and no longer work in a support capacity. Fischer embraced the opportunity and took on project leader responsibilities – a role that he had not been involved in "in some time."

On January 22, 2003, Midby met with Fischer about an unsatisfactory job performance review. The review noted that Fischer's communication and management skills were deficient for his new role as project leader. It further noted that as a result of Fischer's poor performance, another Andersen employee had to set

up an emergency team to complete one of Fischer's projects. Fischer conceded that the other employee had not treated him unfairly. As a result of the review, Midby told Fischer of his intention to put him on a Performance Improvement Plan ("PIP").[2] After this conversation, Fischer allegedly complained of a threat of termination and of age discrimination to Bruce Lundeen, Andersen's human resource specialist. Lundeen, however, recalls only that Fischer had been upset about the review and criticism.

On February 6, 2003, Fischer met with Midby and Jim Moulton, Midby's supervisor, to discuss his job performance. Prior to this meeting, Fischer allegedly learned that a co-worker, Wayne Schmidt, had avoided a PIP by giving Moulton and Midby a retirement date. Accordingly, at the meeting, Fischer volunteered to them that in 1988 he and his wife had decided that he would retire in 2003. He additionally stated that his current plan was to retire as early as August 2003 and no later than December 31, 2003. Because of the time and effort associated with creating and implementing a PIP, Midby testified that it would not be sensible to begin a PIP process in light of Fischer's imminent retirement. Instead, Fischer was to make improvements without formal oversight and would be placed on a PIP only if he did not retire by August and did not improve. Despite testifying that it was fair of Midby and Moulton to request during the February meeting that he improve his work performance, Fischer alleges that the PIP meeting was orchestrated by Midby to force Fischer to give him a retirement date. He also asserts that Midby admitted as much at the time.

_____

[2]Under a PIP, an employee must demonstrate improvement in the areas specified by the supervisor within thirty days. Should the employee fail to do so, he may be reassigned or terminated. Should the employee succeed in improving, additional improvement goals may be imposed under subsequent PIPs for up to sixty additional days.

On May 2, 2003, Midby and Fischer met again because Midby wanted to discuss Fischer's continued lack of performance and the possible imposition of a PIP. Fischer contends that Midby threatened him with a PIP if Fischer did not retire in August. According to Midby's notes of the meeting, however, Midby indicated that he focused on Fischer's performance and discussed imposing a PIP despite Fischer's plan for retirement. After the meeting, Midby decided that a PIP would not be effective given Fischer's attitude and beliefs about his work duties and responsibilities. He therefore recommended to Andersen that Fischer be given the choice of termination or immediate retirement.

After consulting with the head of human resources, Midby eventually changed his mind and agreed to give Fischer another chance. On June 9, 2003, Midby and Moulton presented Fischer with a PIP specifying the general categories of project work, communication, and general work habits as areas requiring improvement. The plan also outlined specific and approachable sub-areas under each of these categories for Fischer to work on. Fischer claimed in his affidavit that the PIP contained impossible demands, but he testified that the objectives set forth in the PIP were reasonable. During the meeting, which Fischer secretly tape recorded, Fischer asked several times whether he could avoid the PIP by setting a specific retirement date. According to the recording, Midby answered in the negative and repeatedly indicated that the performance issues and Fischer's potential retirement were entirely separate. Following the meeting, Fischer felt ill and left work. He was subsequently treated by a physician and was placed on short-term disability due to stress and anxiety. He never returned to work and formally retired on December 5, 2003.

Fischer testified that he chose to retire in order to retain his existing health plan instead of accepting a new health plan that would otherwise replace his current plan in January of 2004. Despite this admission, he also asserts that he was constructively discharged. He alleges that on numerous instances various authoritative employees at Andersen misrepresented facts to him by stating that he would permanently lose his

medical benefits should he be terminated for failing a PIP. Furthermore, he notes that Andersen had not made available any written pension plan summary, as required by statute, that would have definitively clarified the issue. Because he considered the requirements of the PIP impossible to accomplish, Fischer contends that Andersen was effectively offering him a choice between voluntary early retirement with reduced pension benefits that included health benefits, and inevitable termination with the same reduced pension benefits but stripped of the health insurance. Given these circumstances, Fischer argues that he was constructively discharged.

The district court granted Andersen summary judgment on Fischer's claim that Andersen failed to disclose pension plan information in violation of ERISA, finding that the claim had not been pled.[3] It also granted Andersen summary judgment on Fischer's interference with pension benefits claim, holding that Fischer had not made a prima facie case of interference and, in the alternative, even if he had done so, Fischer lacked evidence of pretext in light of Andersen's justification for placing Fischer on a PIP.

## II.

We review the district court's grant of summary judgment *de novo*. Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 841 (8th Cir. 2002). When the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter

---

[3]Fischer does not appear to have appealed the district court's summary judgment on the ERISA reporting claim, even though his arguments in favor of using evidence of Andersen's misreporting for purposes of generating issues of material fact on his section 510 claim include references to the pleading requirements under the Federal Rules of Civil Procedure. We note that even had Fischer appealed the issue, we would have agreed with the district court that Fischer had not properly raised the reporting claim.

of law, summary judgment is appropriate. FED. R. CIV. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

Under section 510 of ERISA, it is unlawful for an employer to discharge a participant in an employee benefit plan "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ." 29 U.S.C. § 1140 (2006). To prevail under his ERISA interference claim, then, Fischer must show that (1) Andersen subjected him to an adverse employment action, (2) he was likely to receive future benefits, and (3) there was a causal connection between the adverse action and the likelihood of future benefits. Kinkead v. Southwestern Bell Tel. Co., 49 F.3d 454, 457 (8th Cir. 1995).

Fischer has not introduced facts sufficient to demonstrate an adverse employment action. He argues that he satisfied this element by providing evidence supporting his conclusion that he was constructively discharged. We disagree. Constructive discharge is implicated only where an employer creates conditions so intolerable that a reasonable person would resign. West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995) (noting also that the standard is objective); Phillips v. Taco Bell Corp., 156 F.3d 884, 890 (8th Cir. 1998) (same). An employee is not constructively discharged when an employer merely implements a PIP. See, e.g., Givens v. Cingular Wireless, 396 F.3d 998, 998-99 (8th Cir. 2005) (per curium) (affirming the district court's finding that there was no basis for constructive discharge where plaintiff was placed on a PIP); Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002) ("criticism in performance reviews and institution of performance improvement plans, alone, do not constitute objectively intolerable conditions"); Rossi v. Alcoa, Inc., 129 Fed. App. 154, 158 (6th Cir. 2005) (same). Nor does a threat of

discharge, in and of itself, create conditions so intolerable that a reasonable person would resign.  Summit v. S-B Power Tool,  121 F.3d 416, 421 (8th Cir. 1997).

Fischer contends that his employment conditions were made intolerable under the PIP not just because it was imposed on him and carried a risk of termination, but because (1) he believed that Andersen imposed a PIP with terms that made termination due to failure inevitable, and (2) he had been informed that he and his wife would permanently lose their otherwise vested health insurance pension benefits[4] should that happen.[5]  Even were we to assume, *arguendo*, that what he describes

---

[4]Viewing the evidence in the light most favorable to Fischer, we must assume that Fischer's belief concerning the potential loss of medical benefits was reasonable. Both Midby and the Andersen Human Resource department purportedly told Fischer that he stood to lose his medical benefits should he be terminated for failure to succeed in a PIP.  Furthermore, as Fischer notes, a written summary of his pension plan was not accessible to him.  Even though his ERISA reporting claim was insufficiently pled, the same evidence for that issue was also relevant to Fischer's § 510 claim.    Because the evidence was elicited in "depositions, answers to interrogatories, and admissions on file," it should therefore be considered for the purpose of ascertaining whether it creates a genuine issue of material fact.  FED. R. CIV. P. 56(c).

[5]Fischer also cites as relevant his frustration that work previously considered satisfactory was suddenly considered poor, his belief that Midby was implacable and would not be satisfied no matter what he did, and his demoralization at seeing his colleagues demoted.  Apart from the question whether Fischer's discomfort was justified — there is evidence suggesting that, for example, skill-based weaknesses were noted even in earlier satisfactory reviews — employees under a new manager trying to turn around a poorly performing department are routinely faced with such issues.  Nothing in the evidence suggests to us that these considerations created an environment intolerable to a reasonable employee.  See Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 496 (8th Cir. 1996) (citing Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.")).

would amount to a constructive discharge provided he had evidence supporting each point, he has not introduced any evidence demonstrating that the PIP was setting Fischer up to fail,[6] or indicating that the PIP requirements were anything but reasonable.[7]

A party may not create a factual dispute by contradicting his own testimony. Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365 (8th Cir. 1983). Setting aside the discrepancy between Fischer's stated reason for resigning and his current position alleging constructive discharge, Fischer's contradictions go still further. Though Fischer stated in his affidavit that the requirements of the PIP were impossible to achieve, he admitted in his deposition that the PIP requirements were largely fair and in conformance with what one would expect from an engineer. Those instructions within the PIP that he believed to be unfair involved either ambiguous language subject to interpretation or performance-weighing metrics left undefined – neither of which represents even inferential evidence that the PIP set him up for

---

[6]Even if another employee may have received a facially impossible to perform PIP, no evidence presented by Fischer generates an inference that an otherwise reasonable PIP should similarly be considered nearly impossible to fulfill. See Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995) (noting that to withstand summary judgment, the non-moving party "must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." (alterations in original) (quoting Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994))).

[7]In fact, as the district court points out, Fischer himself testified that he resigned in order to keep his current medical insurance package and to avoid it from being replaced by the new medical insurance package otherwise taking effect in January 2004. This admission undermines Fischer's assertion that he resigned in response to intolerable conditions, instead of resigning as a matter of personal discretionary choice.

failure.[8]  Instead of asking for clarification so that he could accurately assess whether the few ambiguous PIP tasks about which Fischer had concerns were surmountable and realistic, Fischer simply assumed the worst and relied on speculation and rumor to inform his fatalistic interpretation.  See West, 54 F.3d at 498 ("Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst and not to jump to conclusions too fast." (citation omitted)).  Furthermore, "[a]n employee who quits without giving [his] employer a reasonable chance to work out a problem has not been constructively discharged." Phillips, 156 F.3d at 890 (internal quotation marks and citation omitted).

We conclude that, even viewed in the light most favorable to him, the evidence submitted by Fischer would not support a finding that a reasonable employee placed on such a PIP would have considered failure, subsequent termination, and permanent loss of medical benefits so likely that resignation was the only option.  Accordingly, in the absence of an adverse employment action, Fischer has not made a prima facie showing of intentional interference with his pension benefits.[9]

The judgment is affirmed.

_____

---

[8]For example, the PIP mentioned under the "Communication" heading that people have different preferred methods of communication.  Because of this, the PIP goes on to state that "you may need to invoke methods other than e-mail."  Fischer interpreted this language as requiring him to communicate effectively with floor personnel without ever using E-mail – something he believes to be an impossible feat.  Under the objective standard applicable for constructive discharge determinations, we see no reason to believe that a reasonable employee would have adopted Fischer's interpretation.

[9]We also note that had Fischer made a prima facie showing of interference, his claim would still have failed. Even if the evidence might suggest that Andersen avoided targeting the youngest of workers for PIPs, Fischer's argument that the targeting pattern represents an intent to interfere with retirement benefits is undercut by the significant presence of individuals targeted for PIPs who were many years away from qualifying for even early retirement benefits.