Erin LINCOLN, Individually and as Representative of the Estate of John Lincoln; Kathleen Lincoln, Individually and as Representative of the Estate of John Lincoln, Plaintiffs-Appellees

v.

C. BARNES, Defendant-Appellant

No. 16-10327

United States Court of Appeals, Fifth Circuit.

Filed April 20, 2017

Susan E. Hutchison, Hutchison & Stoy, P.L.L.C., Fort Worth, TX, for Plaintiffs-Appellees.

Bill L. Davis, Seth Byron Dennis, Assistant Attorney Generals, Office of the Attorney General, Austin, TX, for Defendant-Appellant.

Before JOLLY, HIGGINBOTHAM, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Ranger Clair Barnes appeals the denial of his motion to dismiss based on qualified immunity. Because it was clearly established that Barnes's conduct constituted an illegal seizure in violation of the Fourth Amendment, we affirm.

## I. BACKGROUND

This case arises out of the unfortunate police shooting of John Lincoln during a SWAT team operation at his mother's residence. The following facts are taken from Plaintiffs' Amended Complaint, which at this stage we presume to be true. John Lincoln was diagnosed with bipolar disorder and was taking medication to manage it. In December 2013, John ran out of his medication and for reasons unknown was unable to refill his prescription. On December 26, 2013, John had been dining with his father when he took one of his father's guns and left the house. John's father believed that he was headed to the home of his mother, Kathleen Lincoln, and that he was a threat to her life.

When John arrived at his mother's house, she was not there, but John's eighteen-year-old daughter, Erin Lincoln, who lived with her grandmother, was at home and let him into the house. After John left for Kathleen's house, John's father called John's sisters and one of them, Kelly Lincoln, called the Colleyville police. A large SWAT team, including officers from both the Colleyville and North Richland Hills police departments arrived and surrounded Kathleen's house.

A police dispatcher contacted Erin inside the house and asked if she was in harm's way. Erin replied that she was not and that her father would not harm her. She also told the dispatcher that she was talking to her father to try to calm him down and that the police's presence was upsetting him. When the phone rang again, Erin told her father not to pick it up because it would just upset him. Despite her advice, John picked up the phone and spoke with the police. The call upset him greatly.

John then began to open the front door to the house and to shout at the police, while holding his father's gun. Every time he opened the door, Erin was standing immediately next to him. The last time John opened the door, three officers opened fire, killing him and narrowly missing Erin, who was standing by his side.

Erin fell to the ground next to her father's body. She was then forcibly removed, placed in handcuffs, and put in the backseat of a police vehicle. Although she did not fight, struggle, or resist, she did ask the officer why she was being taken into custody and made it known that she wanted to remain with her father.

While Erin was being held in the patrol car, her aunt Kelly, an Arlington Police Department officer, who was on the scene in uniform, informed one of the Colleyville officers that her niece had severe social anxiety disorder and was emotionally distraught and she requested that Erin be released into her care. The Colleyville officer told Kelly that they would not release Erin because they needed to get a statement. Kelly demanded to speak with a supervisor. After about thirty minutes, a

Colleyville Sergeant came over and reiterated that they were holding Erin to get a statement. Kelly responded that they were outside their authority by holding Erin as a witness against her will. The Sergeant refused to release Erin.

After being held in the back of the patrol car for about two hours, Erin was transported to the police station. Kelly went to the station to get Erin, but she was not allowed to see her. At the station, Erin was interrogated for five hours by Ranger Barnes and Officer Kyle Meeks and she was forced to write out a statement. After the officers obtained her statement, Erin was permitted to leave with Kelly. Erin was never charged with any crime.

Erin and Kathleen, individually and as representatives of the estate of John Lincoln, sued the Cities of Colleyville and North Richland Hills, Texas, and several officers involved in the incident, including Barnes. They asserted a variety of constitutional claims under 42 U.S.C. § 1983 stemming from the shooting and Erin's subsequent detention. In pertinent part, Erin asserted that Barnes and Meeks violated her Fourth Amendment right to be free from unreasonable seizure when they took her into custody without a warrant, probable cause, or justifiable reason and interrogated her against her will for many hours, refusing her access to her family, including Kelly Lincoln.

All defendants, including Barnes, filed motions to dismiss. Barnes moved to dismiss on the basis of qualified immunity. In a series of orders, the district court dismissed all of the claims except the unreasonable seizure claims against Barnes, Meeks, and Officer Sandra Scott, who had transported Erin to the police station. As for Barnes, the court held that the allegations concerning Erin's five-hour interrogation at the station, during which she was forced to write out a statement, stated a claim for violation of the Fourth Amendment. The court cited *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), a 1979 Supreme Court decision which held that the involuntary detention and interrogation of an individual without probable cause on the grounds that he possessed information about an unsolved crime constituted an unreasonable seizure. *Id.* at 207, 99 S.Ct. 2248. The district court further determined that Barnes should have been on notice that his conduct was illegal based on a Tenth Circuit decision, *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), which held that an involuntary ninety-minute detention of witnesses to a police shooting for the purpose of obtaining information from them, including their statements, was unreasonable. *Id.* at 1149.

Barnes timely filed an interlocutory appeal to this Court.

## II. JURISDICTION AND STANDARD OF REVIEW

■ We have jurisdiction under 28 U.S.C. § 1291 to review the district court's order denying Barnes qualified immunity as "a collateral order capable of immediate review." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (citing *Behrens v. Pelletier*, 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)). That jurisdiction, however, is "severely curtailed" and "restricted to determinations of questions of law and legal issues, and we do not consider the correctness of the plaintiff's version of the facts." *Id.* (citations, internal quotations, and alterations omitted); *see also Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010).

■ Within this limited jurisdiction, our review of the denial of a motion to dismiss predicated on a defense of quali-

fied immunity is *de novo. Club Retro*, 568 F.3d at 194. We must "take the complaint's factual allegations as true and view them in the light most favorable to the plaintiff." *Hinojosa v. Livingston*, 807 F.3d 657, 661 n.1 (5th Cir. 2015) (citing *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252 (5th Cir. 2005)). "[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm [s]he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* at 664 (internal quotations and citation omitted).

## III. DISCUSSION

### A. Doctrine of Qualified Immunity

■ "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, — U.S. ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)) (internal quotation marks omitted). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotations and alteration omitted). This inquiry "does not require a case directly on point, but existing precedent must have placed the statutory or constitu-

tional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (citations omitted); *see also Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc) ("The *sine qua non* of the clearly-established inquiry is fair warning. Thus, we must ask not only whether courts have recognized the *existence* of a particular constitutional right, but also ... whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct." (internal quotations and citations omitted)).

### B. Fourth Amendment Right to Be Free from Unreasonable Seizure

■ Erin asserts that Barnes violated her Fourth Amendment right to be free from unreasonable seizure by taking her into custody without a warrant, probable cause, or justifiable reason and interrogating her against her will for five hours, during which she was forced to write out a statement. She argues that her detention constituted a *de facto* arrest.

We note at the outset that Barnes does not contend that the officers involved in the incident had a reasonable suspicion that Erin was involved with any criminal wrongdoing or that there was probable cause to believe she had committed or was committing a crime. The rationale for her detention rests solely on her status as a witness to her father's shooting.[1]

The question therefore is whether Erin's detention at the police station for the pur-

---

[1] Barnes suggested in his brief that Erin's detention could be justified on the basis that either reasonable suspicion or probable cause existed to believe she had committed the Texas offense of interference with public duties. *See* Tex. Penal Code § 38.15. At oral argument, however, Barnes's counsel disclaimed reliance on either of these rationales. We therefore do not need to separately address

whether the detention is justified on any basis other than her status as a witness. We note, however, that Barnes also did not raise these arguments in the district court. Thus, even if he continued to press these arguments now, we would not be able to address them as they are forfeited. *See, e.g., United States v. Mix*, 791 F.3d 603, 611 (5th Cir. 2015) (arguments not raised below are forfeited on appeal).

poses of questioning her as a witness to her father's shooting and obtaining her statement satisfied the Fourth Amendment's "reasonableness" requirement. The relevant facts are as follows: Erin witnessed the events leading up to her father's death; after her father was lethally shot by members of the SWAT team, the police had an interest in detaining Erin to solicit information from her, including a statement; toward that end, Erin was handcuffed and placed in the backseat of a patrol car; after a period of approximately two hours, she was transported to the police station; and at the station, Barnes and Meeks questioned her for approximately five hours and forced her to write out a statement.

■ *Dunaway v. New York* involved several materially similar facts. In that case, officers were investigating a crime; they picked up petitioner at a neighbor's house, drove him to police headquarters in a police car, placed him in an interrogation room, and questioned him regarding the crime. 442 U.S. at 203, 99 S.Ct. 2248. He was never "told he was under arrest, [but] he would have been physically restrained if he had attempted to leave." *Id.* (citation omitted). It was undisputed that officers lacked probable cause for the detention. *Id.* at 206, 99 S.Ct. 2248. The State argued that his detention at the police station for questioning was justified on the grounds that police believed he possessed "intimate knowledge about a serious and unsolved crime." [2] *Id.* at 207, 99 S.Ct. 2248 (internal quotations and citation omitted). In holding petitioner's seizure illegal, the Supreme Court emphasized that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as

necessarily to trigger the traditional safeguards against illegal arrest." *Id.* at 216, 99 S.Ct. 2248. *Dunaway*, in fact, merely reaffirmed this principle, which the Court had made clear ten years earlier in *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)—namely, that an investigatory detention that, for all intents and purposes, is indistinguishable from custodial interrogation, requires no less probable cause than a traditional arrest. *Id.* at 726–27, 89 S.Ct. 1394 ("Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.' "); *see also Hayes v. Florida*, 470 U.S. 811, 815, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) ("None of our later cases have undercut the holding in *Davis* that transportation to and investigative detention at the station house without probable cause or judicial authorization together violate the Fourth Amendment."). Accordingly, police violate the Fourth Amendment when, absent probable cause or the individual's consent, they seize and transport a person to the police station and subject her to prolonged interrogation. *Dunaway*, 442 U.S. at 216, 99 S.Ct. 2248.

### C. Clearly Established Law

■ The second part of the qualified immunity inquiry looks to whether the right was clearly established at the time of the violation. The longstanding precedents we have just discussed have placed the instant "constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741, 131 S.Ct. 2074. Nevertheless, Barnes argues that he reasonably could have believed Erin's detention was lawful because she was a wit-

---

**2.** At the time the petitioner was taken in for questioning, he was not yet formally a suspect, although he eventually made incrimina-

ting statements during the interrogation that resulted in charges for attempted robbery and felony murder. 442 U.S. at 203, 99 S.Ct. 2248.

ness to a crime and under certain circumstances, investigatory detentions on less than probable cause are constitutional. Barnes contends that the lawfulness of Erin's detention is not governed by the principle announced in *Davis* and *Dunaway*; rather it should be assessed under the balancing test articulated in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Under that test, the constitutionality of a seizure "involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 50–51, 99 S.Ct. 2637.

Barnes suggests that the *Brown* test governs all witness detentions, relying on *Illinois v. Lidster*, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004), a case in which the Supreme Court upheld the constitutionality of a highway checkpoint at which officers briefly detained motorists to seek information about a fatal hit-and-run accident. *Id.* at 428, 124 S.Ct. 885. In determining that the checkpoint satisfied the Fourth Amendment's reasonableness requirement, the Court analyzed the circumstances under the *Brown* factors. *Id.* at 427–28, 124 S.Ct. 885. The Court found the relevant public concern grave because police "were investigating a crime that had resulted in a human death. . . . And the stop's objective was to help find the perpetrator[.]" *Id.* at 427, 124 S.Ct. 885. The stop significantly advanced the public concern insofar as it was "appropriately tailored . . . to fit important criminal investigatory needs." *Id.* (noting that the stops took place shortly after the hit-and-run, on the same highway near the location of the accident, and about the same time of night). Finally, the stop posed only a minimal interference with the motorists' liberty, requiring only a brief wait in line, and "provided little reason for anxiety or alarm." *Id.* at 427–28, 124 S.Ct. 885.

Neither *Brown* nor *Lidster* are apposite to this case. Critically, *Brown*, which itself concerned the brief detention of an individual under suspicion of wrongdoing, not the prolonged interrogation of a witness to a crime, expressly limited its analysis to "[t]he reasonableness of seizures that are less intrusive than a traditional arrest." 443 U.S. at 50, 99 S.Ct. 2637. *Lidster* also involved a seizure that fell far short of a traditional arrest. Moreover, in *Lidster*, the fact that "the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect" was, in the Court's view, the "[m]ost important[ ]" factor weighing in favor of the checkpoint's constitutionality. 540 U.S. at 427, 124 S.Ct. 885. These circumstances plainly distinguish these cases and their reasoning from the facts at bar.

If there was any lingering doubt, however, we need only turn back to *Dunaway* to dispel the notion that custodial interrogation of the kind here is subject to a balancing inquiry. In *Dunaway*, the State, like Barnes, had urged the application of a *Terry*-style balancing test to assess the reasonableness of custodial interrogations for investigatory purposes. 442 U.S. at 211, 99 S.Ct. 2248. The State argued that such seizures could be justified by mere 'reasonable suspicion.' *Id.* The Court flatly rejected this approach. It stated:

> *Terry* and its progeny clearly do not support such a result. The narrow intrusions involved in those cases were judged by a balancing test rather than by the general principle that Fourth Amendment seizures must be supported by the 'long-prevailing standards' of probable cause, only because these intrusions fell far short of the kind of intrusion associated with an arrest.

*Id.* at 211–12, 99 S.Ct. 2248 (internal citation omitted). The same reasoning controls the outcome of the case at bar.

Barnes also relies on *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), arguing that it suggests Erin's five-hour interrogation was reasonable in light of the nearly sixteen-hour detention found reasonable there. First, *Montoya de Hernandez* was a case in which the detaining officers had reasonable suspicion that the detainee was smuggling illicit drugs across the border. *Id.* at 534, 544, 105 S.Ct. 3304. Therefore, the case has little bearing on the law concerning witness detention. Even if it did, the unusually long warrantless detention there was justified by the particular circumstances, where the officers had articulable suspicion that the detainee was smuggling drugs in her alimentary canal. *Id.* Under those circumstances, "[h]er detention for the period of time necessary to either verify or dispel the suspicion was not unreasonable." *Id.* at 544, 105 S.Ct. 3304.

Nothing in Plaintiffs' Amended Complaint suggests that comparable exigent circumstances existed here. Nor does Barnes contend that such circumstances existed to justify Erin's prolonged detention and, most pertinently, her custodial interrogation. Indeed, police were not even questioning her about an unsolved crime for which the perpetrator might still be at large. They knew well who had caused John Lincoln's death.

We also make no attempt to draw lines here regarding the duration of the detention. Therefore, Barnes's concern that the district court unduly focused on the duration of Erin's detention and that it improperly relied on *Walker*, 451 F.3d at 1149, to conclude that her five-hour detention was clearly unreasonable is misplaced. Although we observe that our cases recognize that a detention of excessive duration can sometimes morph an investigatory stop into a *de facto* arrest, *see, e.g., United States v. Massi*, 761 F.3d 512, 521-22 (5th Cir. 2014); *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008), our holding here rests on the nature of Erin's detention and the lack of circumstances justifying her custodial interrogation. *Walker* is persuasive authority that the prolonged detention of witnesses to a police shooting for the sole purpose of obtaining information from them, including statements, is unreasonable absent any exigencies justifying the detention for investigative purposes. 451 F.3d at 1149. But the clearly established law governing this case derives from *Davis* and *Dunaway*, not *Walker*.

## IV. CONCLUSION

While "the law ordinarily permits police to seek the voluntary cooperation of members of the public in the investigation of a crime," *Lidster*, 540 U.S. at 425, 124 S.Ct. 885, "[a]bsent special circumstances, the person approached may not be detained ... but may refuse to cooperate and go on his way," *Terry v. Ohio*, 392 U.S. 1, 34, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (White, J., concurring); *see also Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Any further detention of such individual constitutes a seizure under the Fourth Amendment, which must satisfy the Fourth Amendment's "reasonableness" requirement. *Lidster*, 540 U.S. at 426–27, 124 S.Ct. 885. As a general matter, the detention of a witness that is indistinguishable from custodial interrogation requires no less probable cause than a traditional arrest. *Dunaway*, 442 U.S. at 216, 99 S.Ct. 2248; *Davis*, 394 U.S. at 726–28, 89 S.Ct. 1394.

AFFIRMED.