# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

United States Court of Appeals
Fifth Circuit

**FILED**

April 5, 2018

Lyle W. Cayce
Clerk

No. 17-10201

————

ERIN LINCOLN, Individually and as Representative of the Estate of John Lincoln,

       Plaintiff - Appellant

v.

SANDRA SCOTT; KYLE MEEKS,

       Defendants - Appellees

--------------------------------------------------------------------

Cons. w/17-10841

ERIN LINCOLN, Individually and as Representative of the Estate of John Lincoln

       Plaintiff - Appellant

v.

C. BARNES

       Defendant - Appellee

————

Appeals from the United States District Court
for the Northern District of Texas

————

No. 17-10201 c/w 17-10841

Before STEWART, Chief Judge, and CLEMENT and SOUTHWICK, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Before the court is Erin Lincoln's appeal of the district court's grant of qualified immunity to three police officers—Sandra Scott, Kyle Meeks, and Clair Barnes—who responded to a shooting incident involving her father. For the reasons set forth below, the district court's grant of summary judgment is affirmed.

## I.

On December 26, 2013, agents of the Colleyville Police Department ("CPD") responded to a report that a man, armed with a gun, was on his way to an identified location—4101 Lexington Parkway in Colleyville, Texas—to kill his mother. Sergeant Charles Tinsman was initially dispatched, and he arrived at the scene with two other CPD officers; as the incident unfolded, more CPD officers and officers from other agencies also arrived. The dispatcher informed the officers that John Lincoln and his daughter, Erin Lincoln, were inside the house, that Erin had confirmed John was armed, and that she did not feel threatened.[1] During the incident, John repeatedly came to the front door of the house, would open the door, and make comments such as "come and take it," and "make your move." The officers requested that a SWAT team assemble because John was armed and posed a threat to his mother, his daughter, and the officers. Sgt. Tinsman said that he heard SWAT officers instruct John to "drop the weapon" and shortly after there was a burst of gunfire. The shots were fired at approximately 9:59 p.m.

---

[1] John's mother was not at the home when he arrived there armed, nor was she there during any of the ensuing incident.

John was hit by the gunfire and eventually died from the gunshots. He fell very close to the threshold of the front doorway, and Erin began screaming. SWAT team members immediately secured the scene and ensured John could not access his handgun; the officers requested immediate medical attention for John. Erin was the only other person in the home and rushed to her father's side as soon as the shots were fired. SWAT officers had to physically remove Erin from her father's side to secure the scene and provide John medical attention. When the officers removed Erin, she was handcuffed, taken through the back exit of the house, and placed in the back seat of a CPD officer car. The officers stated that Erin was kicking and screaming when they removed her. Erin was eventually uncuffed and waited in the police car while the other responding officers—including Kyle Meeks, Sandra Scott, and Clair Barnes—performed initial investigatory work, partly in preparation for Erin's interview. Sgt. Tinsman stated that each time he checked on Erin in the vehicle, another officer was with her; he also stated that Erin never told him that she wanted to leave.

*A. Sandra Scott*

Sandra Scott worked as a CPD Officer at the time of the incident. When Scott was first dispatched to the scene, her role was to patrol pedestrians and vehicles entering the neighborhood. She did not witness the circumstances that led to the ultimate shooting of John. Roughly two hours after the shooting, Scott was summoned to the house where John was shot and asked to transport Erin in a police car to the CPD station. Scott stated that she transported Erin from the scene around 12:40 a.m. on December 27, 2013.

At the time she transported Erin, Scott knew only that Erin was a member of the family that lived at the house where the incident occurred, that she was John's daughter, and understood that Erin was a witness who Detective Meeks was to interview. Scott was not present during Erin's

interview at the CPD station. After Erin's interview concluded, Scott took pictures of a few scrapes and abrasions on Erin's body that happened during her removal from the scene. Scott had no further interaction with Erin. Scott asserted that Erin never expressed any wish not to give an interview or not to be transported to the CPD station. She tacitly assumed that Erin was a cooperative witness.

### B. Kyle Meeks

Kyle Meeks was the on-call detective for the CPD when he was advised, around 10:43 p.m. the night of the incident, that he needed to respond to 4101 Lexington Parkway. Officers already on the scene briefed Meeks on the events surrounding the shooting. The officers also instructed Meeks that Erin rushed to her father's side immediately after he was shot and that she was hysterically screaming. Meeks was also told that Erin had to be physically removed from the scene to ensure medical personnel could assist John and also to ensure the officers could secure the scene and remove John's handgun.

When Meeks found out that Erin was waiting in a police car, he went to the car, where Erin was sitting with a female officer, and asked Erin if she was okay and if she needed anything. Erin told Meeks that she was okay, and after checking on her, he believed it was reasonable for her to wait in the car for a number of reasons. The officers needed to remove Erin from the scene to prevent any continuing interference with the efforts to secure the scene for investigation, to remove John's handgun, and to provide him medical attention. Further, it was a cold night, so he assumed having her stay inside a warm car would be preferable because she was not warmly dressed. Also, at the time Erin was waiting in the car, it was not known to what extent she was involved as either a victim, witness, or even a suspect.

Meeks and Scott (who transported Erin) left the scene and headed to the CPD station around the same time, where Ranger Clair Barnes was waiting to

interview Erin. Meeks also understood that other members of Erin's family were also going to the CPD station and had agreed to a voluntary interview. At the station, Meeks conducted an initial interview with Erin that lasted about 11 minutes. Meeks asked Erin if she would write a statement about the incident; Erin agreed and wrote a five page statement. Erin remained at the station, sitting with her family, while other members were interviewed. Regarding Erin's cooperativeness as a witness, Meeks stated:

> During Erin Lincoln's interview, and again while I was talking to Ranger Barnes and other Police Officers to find out if there were additional questions that should be asked, I repeatedly checked with Erin Lincoln to see if she was okay or needed to use the restroom. At no time did Erin Lincoln give me any indication that she wanted to be anything except cooperative with the interview process. She did not at any time indicate that she wanted to leave. She did not at any point indicate that she was unwilling to be interviewed. At all times she appeared to be a cooperative and willing subject of an interview. Despite her claim . . . that she was interrogated for 5 hours, the total amount of time that went by from the beginning of the interview to the time the entire interview process ended was about 1 hour and 43 minutes . . . . [2]

Finally, Meeks asserted that based on the information provided to him regarding Erin's behavior when she had to be removed from the scene, there was probable cause to charge Erin with interference with performance of public duties and assault. However, Meeks was only focused on his investigative duties, and no charges were ever filed against Erin.

C. *Clair Barnes*

Similar to Scott and Meeks, Ranger Barnes was at the scene of the incident but did not play any part in Erin's removal from the home and

---

[2] The record indicates Erin was at the CPD station for around 2 hours and 17 minutes, 1 hour and 43 minutes of which involved her interview process and the remainder of the time was waiting for family members' interviews. The cumulative detention was roughly 4 hours.

placement in the police car. At the scene, Barnes was only informed of the events that occurred and was briefed so that he could eventually interview Erin. According to Barnes, his first interaction with Erin was in the CPD station interview room with Meeks. Barnes indicated that Meeks asked most of the interview questions, and Erin answered the questions in an engaged and calm manner. Barnes thought Erin was cooperative and stated that "[a]t no time did Erin ask if she had to answer questions, or indicate that she no longer wished to answer any questions or be further interviewed." Ranger Barnes asserted that he and Meeks asked Erin if she was okay or needed anything multiple times throughout the duration of the interview. Ranger Barnes had no further interaction with Erin after exiting the interview room to allow her to prepare her written statement.

## D. District Court

Meeks, Scott, and Barnes filed motions for summary judgment in the district court, asserting qualified immunity. The district court granted qualified immunity as to each officer and dismissed Erin Lincoln's claims against them.[3] Erin timely appealed.

## II.

"We review a district court's grant of summary judgment de novo, applying the same standard on appeal as that applied below." *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute as to material fact exists if the evidence is such that

---

[3] The district court first granted qualified immunity as to Scott and Meeks in the same memorandum opinion and order. Barnes proceeded separately, and the district court granted Barnes qualified immunity in a brief memorandum opinion and order, adopting its reasoning from its previously issued opinion for Scott and Meeks.

a reasonable jury could return a verdict for the nonmoving party." *Rogers*, 755 F.3d at 350 (internal quotation marks omitted). "This court construes all facts and inferences in the light most favorable to the nonmoving party." *Id.* (internal quotation marks omitted). But "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012).

"We are not limited to the district court's reasons for its grant of summary judgment and may affirm the district court's summary judgment on any ground raised below and supported by the record." *Rogers*, 755 F.3d at 350 (quoting *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 606–07 (5th Cir. 2014)).

"[O]fficers are entitled to qualified immunity under [42 U.S.C.] § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Erin alleges that the officers violated her Fourth Amendment rights, and that the officers are not entitled to qualified immunity. We consider each prong in turn.

No. 17-10201 c/w 17-10841

### III. Fourth Amendment Standard

#### i.    *Seizure*

The Fourth Amendment states in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. amend. IV. "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (citing *Davis v. Mississippi*, 394 U.S. 721 (1969) and *Terry v. Ohio*, 392 U.S. 1 (1968)).

Erin generally alleges that the officers violated her Fourth Amendment rights. "Whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person . . . ." *Terry*, 392 U.S. at 17. Erin was physically removed from the scene, placed in a cop car, and—although never told she had to stay there—felt that she was not free to leave. As this court has recognized, "there are different 'tiers of citizen-police contact for purposes of Fourth Amendment analysis.'" *Lincoln v. Turner*, 874 F.3d 833, 840 (5th Cir. 2017) (quoting *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014)). The different "tiers" of Fourth Amendment protection trigger varying legal analyses. At a minimum, Erin's seizure was an investigatory, suspicionless seizure, triggering a Fourth Amendment reasonableness analysis. *See Brown v. Texas*, 443 U.S. 47, 50–51 (1979).

#### ii.    *Reasonableness*

When deciding whether a seizure is reasonable, the court must weigh "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 51. "[T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual . . . ." *Id.*

8

Erin contends that the officers unreasonably detained her, held her in the police car, and subjected her to an interview at the CPD station.

Here, the officers advance two basic rationales for the seizure, both of which relate to underlying investigatory purposes. First, the seizure was reasonable as a means of obtaining information from Erin, who was the only person, besides John, in the home during the incident. Second, the seizure was reasonable as a means of securing the crime scene.  This court has noted that there are few cases addressing the reasonableness of detaining witnesses solely for investigative purposes. *See Turner*, 874 F.3d at 845; *see also Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013).

For example, in *Walker v. City of Orem*, the Tenth Circuit considered a nearly identical issue. Officers shot and killed a man in a residential driveway, with his family members watching from the home's front porch. 451 F.3d 1139, 1144–45 (10th Cir. 2006). When the family members sought to run to the victim's side, officers would not allow them to go near the victim. *Id.* at 1145. Instead, the officers pointed guns at the family members and required them to remain in their home for questioning. *Id.* They were detained for nearly one and a half hours. *Id.* The officers there similarly asserted the detention was reasonable to secure the crime scene and to obtain information from the detained witness. *Id.* at 1148. The court held that a 90-minute detention of witnesses not suspected of criminal activity violated Fourth Amendment protections. *Id.* at 1150. It reasoned that "the lengthy detention . . . was unreasonable and was not justified by either the need for investigation of a crime or control of a crime scene." *Id.*

Similarly, in *Maxwell v. County of San Diego*, the Ninth Circuit considered the reasonableness of a five-hour detention of witnesses to a crime. 708 F.3d at 1083. It stated that "[a]lthough detention of witnesses for investigative purposes can be reasonable in certain circumstances, such

detentions must be minimally intrusive." *Id.* Even in a context where criminal activity was suspected, the "Supreme Court has never endorsed a detention longer than 90 minutes." *Id.* at 1084 (citing *United States v. Place*, 462 U.S. 696 (1983)). As such, a five-hour detention of a witness absent any suspicion was unreasonable. *Id.*

Although it may have been reasonable "to detain Erin for some amount of time to determine her role in the situation[,]" Scott, Meeks, and Barnes "exceeded this authority when [they] . . . detained her in the back of a police car for two hours." *Turner*, 874 F.3d at 849. Moreover, these three officers extended the seizure through the time Erin was interviewed at the CPD station—a total of roughly four hours.[4] Unlike the situation in *Walker*, Erin was present at an active scene, and it was unclear whether John still posed a threat to her or the officers because his gun was not secured. It may have been reasonable for the officers to remove her from the scene given her proximity, but it does not necessarily follow that they had unbound authority to hold her for roughly four hours, notably without probable cause. *See Maxwell*, 708 F.3d at 1083. "In doing so, [they] violated Erin's constitutional rights." *Turner*, 874 F.3d at 849; *see also Walker*, 451 F.3d at 1149. Accordingly, although the officers violated Erin's Fourth Amendment rights by detaining her for four hours without probable cause, the court must determine whether that right was "clearly established."

### IV. Clearly Established

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be 'settled law,' which means it is dictated by 'controlling authority' or a 'robust consensus of cases of

---

[4] Although Scott did not have contact with Erin once at the CPD station, Meeks and Scott's joint brief does not raise this issue as a means of lessening or distinguishing Scott's potential liability.

persuasive authority.'" *Wesby*, 138 S. Ct. at 589–90 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) and *al-Kidd*, 563 U.S. at 741–42). "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 590 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

In a recent, related appeal, this court held that it was not clearly established that an officer could not detain the sole compliant witness to a police shooting. *Turner*, 874 F.3d at 849.[5] The court disagreed with Erin's reliance on *Dunaway v. New York*, 442 U.S. 200 (1979) and *Davis v. Mississippi*, 394 U.S. 721 (1969), as evidence that the Fourth Amendment right violated was clearly established. *Turner*, 874 F.3d at 849. It held that those cases did not "clearly establish[] that a law enforcement officer could not detain a witness to a police shooting for . . . two hours while a SWAT team sorted out the scene, [particularly] when the witness was standing beside a person when

---

[5] In a different related appeal, concerning Barnes's appeal of the district court's denial of his motion to dismiss, this court affirmed the district court. *Lincoln v. Barnes*, 855 F.3d 297, 304 (5th Cir. 2017). The court stated that there was an issue of "whether Erin's detention at the police station for the purposes of questioning her as a witness to her father's shooting and obtaining her statement satisfied the Fourth Amendment's 'reasonableness' requirement." *Id.* at 301–02. The court concluded that the issue had been squarely addressed by the Supreme Court, which established that "police violate the Fourth Amendment when, absent probable cause or the individual's consent, they seize and transport a person to the police station and subject her to prolonged interrogation." *Id.* at 302 (citing *Dunaway v. New York*, 442 U.S. 200, 216 (1979)). The court ultimately determined that this right was "clearly established" by *Davis v. Mississippi*, 394 U.S. 721 (1969) and *Dunaway*, but noted that its conclusion did not turn on the duration of the interrogation. *Id.* at 304. However, once the case reached summary judgment proceedings, the evidence illustrated that Erin was a compliant witness, and the officers believed her to be consenting to the detention. Therefore, the right at issue before *this* court is whether detaining the sole, *compliant* witness to a police shooting is clearly established; we find the answer to that question is definitively no.

the police shot him." *Id.* at 850; *cf. Maxwell*, 708 F.3d at 1083 ("In most cases, the lack of on-point precedent would compel us to grant qualified immunity.").

Moreover, *Walker* similarly determined that the officers did not violate clearly established law when officers forcefully detained witnesses in their own home. *Walker*, 451 F.3d at 1151 ("[W]e have found no pertinent Supreme Court . . . decision prior to the events in question, and no clearly established weight of authority from other courts, that would have made the unlawfulness of the officers' conduct apparent to them."). The intricate facts here—reasonableness of detaining a sole, compliant witness to a police shooting—have never been directly addressed or clearly established by this Circuit or the Supreme Court. *See Turner*, 874 F.3d at 849. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the *particular circumstances* that he or she faced.'" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)) (emphasis added). Our inability to point to a string of cases establishing "settled law" that these facts amount to a Fourth Amendment violation demonstrates that the violated right was not so clearly established that these officers can be liable. *See id.*

In sum, this court, as well as other circuits, have determined that officers acting under similar circumstances—detaining a sole witness for questioning and investigative preservation—do not violate any clearly established right. It follows that these officers—Meeks, Scott, and Barnes—similarly were not bound by any such clearly established law. The district court correctly granted these officers qualified immunity.

Affirmed.

12