# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 06-3842

_____

Kenneth Seymour, Rachel Seymour, &ast;
&ast;
&ast;
Appellants, &ast;
&ast; Appeal from the United States
v. &ast; District Court for the
&ast; Southern District of Iowa.
City of Des Moines, Brian Danner, &ast;
Barry Arnold, &ast;
&ast;
Appellees. &ast;

_____

Submitted: May 18, 2007
Filed: March 25, 2008

_____

Before WOLLMAN, BRIGHT, and JOHN R. GIBSON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Kenneth and Rachel Seymour appeal from the district court's[1] order granting summary judgment to the City of Des Moines, Iowa ("the City"), and Des Moines police officers Detective Brian Danner and Sergeant Barry Arnold (collectively "the defendants"). We affirm.

---

[1]The Honorable Thomas Shields, United States Magistrate Judge for the Southern District of Iowa, to whom the case was referred by consent of the parties under 28 U.S.C. § 636(c)(1).

I.

A.      The Events of March 20, 2002

On March 20, 2002, the Seymours (whom we shall refer to by their first names) were the parents of three sons: three-year-old Joshua, eighteen-month-old Joseph, and four-month-old Nathaniel. At about 6:30 that evening, Rachel left the home to do some shopping, taking Joshua with her while Kenneth remained at home with Joseph and Nathaniel. Sometime during the evening, Nathaniel became fussy. Kenneth tried to calm him by holding him and placing him in a child swing. Nathaniel remained fussy. Believing that the child might be hungry, Kenneth tried twice to reach his wife on her cell phone, but was unsuccessful. Nathaniel eventually calmed down, and Kenneth placed him on the chair upon which Nathaniel typically slept during the day. Kenneth was later able to reach his wife and suggested that she come home.

After Rachel returned home, she and Kenneth prepared Joseph and Joshua for bed. When Rachel checked on Nathaniel, she discovered that he was not breathing. Kenneth called 911, and emergency medical personnel came to the home shortly thereafter. Members of the Des Moines Police Department, including Officer Richard Ramsey (a patrol supervisor) and Officer Lorena Bland, arrived around the same time as the ambulance. Rachel accompanied Nathaniel in the ambulance to the hospital. Kenneth remained home with Joshua and Joseph, intending to join his wife at the hospital once someone arrived to watch the children.

Officer Ramsey called Sergeant Arnold, who was the head of the department's child abuse investigative team, and apprised him of the following facts: that the child had been fussy; that the father had twice tried unsuccessfully to reach the mother on her cell phone; that the child eventually fell asleep; that when the mother later returned the father's call the father told her that it was time for the child to be fed; and that when the mother got home and checked on the infant, he was not breathing.

Arnold was also told that the mother had already left for the hospital and that the father had stayed home to care for their two other children. Arnold told Ramsey, "Well, just have him [Kenneth] wait there, and we will be out there very quickly."

Arnold then called Detective Brian Danner, the on-call officer in the crimes against children unit, and told Danner to meet him at the Seymour residence. Arnold next called Detective James Keller of the child abuse unit and directed him to go to the hospital. Arnold testified that he thought that Kenneth wanted to stay with the children and that, assuming neighbors or family came to the home to watch the children, he (Arnold) would quickly arrive at the Seymour residence, take Kenneth to the hospital, and conduct a short interview. Arnold also called the Child Protective Services supervisor and apprised him of the situation. Arnold testified that he made the call as a matter of professional courtesy and that he was not reporting child abuse, which would have required Child Protective Services to respond.

Kenneth's father arrived at the residence shortly after the ambulance had departed. At some point, other individuals arrived as well. Kenneth told the officers on the scene that he wanted to leave for the hospital, but was informed that he had to stay where he was until the detectives arrived. Relatives asked whether Kenneth could leave and were told that he was required to remain.

Shortly before Arnold arrived at the Seymours' home, Keller called him from the hospital and told him that Kenneth's presence was requested at the hospital. He also told Arnold that Nathaniel was not going to survive and that the doctors would stop performing CPR once Kenneth arrived. Arnold called Detective Danner, who by this time had arrived at the Seymour home, and told him that he would be there very shortly and that he and Danner would need to drive Kenneth to the hospital as soon as they were able to do so.

Danner arrived approximately twenty minutes after Kenneth's father. Danner was inside the residence for a short while and then went outside with Kenneth. Arnold arrived while Danner and Kenneth were outside. Upon arriving at the Seymour residence, Arnold briefly discussed with Kenneth which of Kenneth's relatives would stay behind with the children. Arnold and Danner then drove Kenneth to the hospital, with Danner questioning Kenneth during the trip. Once they arrived at the hospital, it appears that Arnold, who had been driving, began asking most of the questions. Some of the questions concerned the possibility that Kenneth may have accidentally dropped Nathaniel or that Kenneth, frustrated by Nathaniel's fussiness, may have shaken him. Kenneth told the officers that nothing out of the ordinary had happened while he was watching Nathaniel, whereupon Arnold concluded the questioning and permitted Kenneth to leave the vehicle. Nathaniel died shortly after Kenneth arrived at the hospital. The parties agree that Nathaniel's death was not the result of any criminal behavior by Kenneth. The most likely cause of death was Sudden Infant Death Syndrome (SIDS).[2]

B.    Training, Policies, and Procedures

Because Arnold was the officer in charge of the investigation, it is his training and experience, rather than Danner's, that we will discuss. In addition to his other training, Arnold had attended classes on child fatality investigations and a week-long course on investigating the physical and sexual abuse of children offered by Fox Valley Technical College (Fox Valley) and sponsored by the United States Department of Justice.[3] The Des Moines Police Department does not offer formal

---

[2]Although the parties sharply contest the timing and duration of various events, the exact timing is not material to our analysis of this case. At the least, forty-five minutes elapsed between Kenneth's first request to leave his home and his exit from Arnold's vehicle.

[3]Arnold is also a member of the Polk County Child Death Review Team, a group that reviews child deaths and informs the legislature of its findings.

internal training on child abuse investigations, relying instead on the training offered in courses such as those offered by Fox Valley. The department's procedures are derived from the Fox Valley course as well as from the Fox Valley training manual. Arnold testified that although the procedures they use are adopted from the Fox Valley training, the Fox Valley training manual does not establish City policies.

Arnold testified that "[the child abuse unit's] initial response is to treat all child death as a possible homicide until [their] investigation proves otherwise," and explained that in child death investigations evidence of physical trauma sometimes fails to appear until the autopsy. The department's standard practice in child death cases is to interview the individuals who were caring for the child before the medical emergency occurred. Standard procedure also calls for detaining and separating those persons present at the scene. Arnold noted, however, that "nobody is considered a suspect." He also testified that it would not always be necessary to detain those persons at the scene. Questioning generally serves a two-fold purpose: that of obtaining medically useful information and acquiring information about possible crimes. Both Arnold and Danner testified that not all investigations call for the same procedures.

C.    Testimony Regarding Kenneth's Detention

Arnold testified that "[w]e did not have any indications [while he was on his way to the Seymour residence] that there was any child abuse." He also testified, however, that the officers did not know whether Nathaniel's medical distress was the result of SIDS or an inflicted injury. When asked why he ordered Kenneth to be detained, he stated that his "first thought was that he had stayed there on his own volition to care [for] his children. We wanted to talk to him. And I believe that we were going to make a very timely response there." Arnold also added that he thought that Kenneth would try to contact family members or neighbors who could come over and watch the children and that once Arnold arrived, he would be able to take Kenneth

-5-

to the hospital. Arnold testified that there was no reason why Kenneth would be detained once family members had arrived to take care of the children and that had he been informed of Kenneth's desire to go to the hospital, he would have tried to accommodate that request. He added that taking Kenneth to the hospital would be consistent with his training. Arnold testified further that, in the circumstances, it was appropriate to interview Kenneth while he was apart from the other family members.

D.    The Present Action

This case was removed to federal court under federal question jurisdiction. See 28 U.S.C. § 1441(a) and (c). The Seymours' third amended petition alleges that the defendants violated their constitutional rights while acting under color of state law, in violation of 42 U.S.C. § 1983. They also allege various state law causes of action that include defamation, false imprisonment, and intentional infliction of emotional distress. The district court granted the defendants' motion for summary judgment, concluding, *inter alia*, that the section 1983 claim failed because the officers were entitled to qualified immunity. As for the state law claims, although the district court rejected the defendants' argument that they were entitled to emergency response immunity, it nevertheless concluded that the Seymours' state law claims failed for other reasons.

## II.

We review *de novo* the district court's order granting the defendants' motion for summary judgment. Ferguson v. United States, 484 F.3d 1068, 1072 (8th Cir. 2007) (citation omitted). Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fischer v. Andersen Corp., 483 F.3d 553, 556 (8th Cir. 2007) (citations omitted).

A.     The Federal Cause of Action

In their section 1983 claim, the Seymours contend that Kenneth's detention at his home violated his Fourth Amendment right to be free from unreasonable seizures. Specifically, they argue that the seizure was unsupported by reasonable suspicion of criminal activity, that it was unreasonably lengthy, and that it was tantamount to an arrest without probable cause. They further contend that Arnold and Danner are not entitled to qualified immunity for this constitutional violation because reasonable officers in their position would have known that their conduct violated the law. The Seymours also argue that the City is liable for the officers' constitutional tort because the violation sprang from the City's constitutionally suspect policies regarding child death investigations.

1.     The Officers' Liability

To determine whether an officer is entitled to qualified immunity, courts undertake the two-part analysis set forth in Saucier v. Katz, 533 U.S. 194 (2001). The first step requires us to ask whether the officer's conduct violated a constitutional right. Id. at 201. If the officer has violated a constitutional right, the inquiry next turns to whether that right was clearly established in the context of the situation the officer faced. Id. at 201-02.

"For an investigative Terry-type seizure to be constitutional under the Fourth Amendment, an officer must be aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Donnelly, 475 F.3d 946, 952 (8th Cir.) (quotation omitted), *cert. denied*, 127 S. Ct. 2954 (2007). Courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983). "An investigative detention may

turn into an arrest if it 'lasts for an unreasonably long time,'" Donnelly, 475 F.3d at 953 (quoting United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999)), "or if it is too intrusive." Pace v. City of Des Moines, 201 F.3d 1050, 1054 (8th Cir. 2000) (citing United States v. Dixon, 51 F.3d 1376, 1380 (8th Cir. 1995)).

Before addressing Kenneth's detention in detail, we observe first that, on appeal, the defendants justify the detention primarily in terms of the state's interest in investigating a possible crime rather than on acquiring information that may have been useful for Nathaniel's treatment. This emphasis on criminal investigation echoes evidence in the record indicating that the officers' actions were directed principally toward investigating possible criminal activity.[4] Accordingly, our inquiry will focus on whether Kenneth's detention was a reasonable law enforcement measure and not on whether there were any community caretaking concerns that may have justified the restriction on Kenneth's liberty. Cf. Samuelson v. City of New Ulm, 455 F.3d 871, 877 (8th Cir. 2006) (recognizing that law enforcement may, under some circumstances, seize someone for the purposes of protecting public and individual safety, even if there is no suspicion of criminal activity) (citations omitted).

The evidence viewed in the light most favorable to the Seymours indicates that Kenneth's detention commenced when Kenneth was told by an officer on the scene that he was to remain at the Seymour home until Arnold arrived. Although Arnold testified that he thought that Kenneth had stayed behind willingly so that he could watch his other children, the order nevertheless constituted a curtailment of Kenneth's freedom. Even if he was unlikely to have used that freedom to go to the hospital before neighbors or relatives had arrived, a reasonable person in Kenneth's position

---

[4]Danner and Arnold state in an affidavit, for example, that "the only purpose of all [their] actions that evening [was] to determine whether the cause of [Nathaniel's] medical emergency was criminal in nature." We also note that the officers questioned Kenneth even after Arnold had reason to believe that no medically useful information was likely to be elicited because he knew from Detective Keller's telephone call that Nathaniel was not going to survive.

would have believed that he was not at liberty to ignore the officers' instructions to remain at home. Cf. United States v. Mendenhall, 446 U.S. 544, 554 (1980) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). In sum, we conclude that Kenneth's seizure commenced upon his being told that he was not free to leave and did not end until he was allowed to exit Arnold's vehicle.[5]

We turn next to the justification for the seizure. The defendants appear to contend that the seizure was based upon a reasonable suspicion that Kenneth may have committed a crime. In their brief, the defendants recite a litany of crimes that an officer might have suspected: child endangerment, willful injury, attempted murder, and murder. In appraising this argument, we note first that there is nothing inherently suspicious about a fussy baby or about a father calling the child's mother to inquire about the mother's return so the baby could be fed. Moreover, the record does not clearly indicate the likelihood that an infant's otherwise unexplained medical distress should be attributed to criminal conduct, as opposed to non-criminal causes, such as SIDS. Arnold offered no testimony regarding the relative frequency of criminal as compared to non-criminal causes in child death cases. Rachel, an attorney who has worked since 1999 as an attorney with the Polk County Juvenile Public Defender's

---

[5]The defendants, citing United States v. Sharpe, 470 U.S. 675, 687-88 (1985), argue that some of the detention's duration is attributable to Kenneth himself. They contend that Kenneth could not have left until the relatives had arrived and that he had spent some time deciding who should care for his children. Kenneth's decision to wait for relatives did nothing to prolong the detention, and any delay resulting from his indecision regarding who would stay behind appears to have been brief. Sharpe is thus inapposite because in that case, the delay "was attributable almost entirely to" one of the defendants. Id. at 687-88. We also note that any indecision over child-care arrangements at this point would not compel the conclusion that Kenneth would have been unprepared to leave the house if he had been afforded the opportunity to do so earlier.

Office, and who is active in a SIDS support group, testified that SIDS is the leading cause of infant deaths. The defendants contend, referring to Arnold's deposition testimony, that Arnold knew from his "training and experience that fussy children often become battered children." (Appellee Br. at 2). The record does not appear to reflect any such testimony by Arnold.[6] Arnold testified instead that he had told Kenneth in the car that "[i]n cases of shaken babies, crying is the most frequent trigger mechanism that causes good people to make a really poor decision and shake them just to try to get them to stop crying." Observing that shaking is commonly precipitated by frustration over fussiness is not the same as suggesting that fussiness often leads to shaking. It bears mention, too, that Arnold testified that there was no indication of child abuse at the time he ordered the detention.

We also observe that in cases such as this, where the facts allegedly giving rise to a suspicion of criminality may reasonably appear to untrained eyes to be innocent in nature, we require some explanation regarding how the officer's training endowed seemingly innocent facts with criminal significance. See United States v. Johnson, 171 F.3d 601, 604 (8th Cir. 1999) ("[T]he Fourth Amendment requires an officer to explain *why* the officer's knowledge of particular criminal practices gives special significance to the apparently innocent facts observed." (emphasis in original)). The officers do not adequately explain how their training and experience might have led a reasonable officer to suspect that Kenneth had committed a crime. In light of the foregoing, we cannot conclude from this record that Kenneth's detention was supported by a reasonable suspicion of criminal activity.

Having determined that the detention violated Kenneth's constitutional right to be free from unreasonable seizures, we turn to the second step of our qualified immunity analysis, which requires us to consider whether the right was clearly

_____

[6]At oral argument, counsel for the defendants implied that the fact that the caregiver was male was a relevant consideration. We have found no support for that contention in the record.

-10-

established. <u>Saucier</u>, 533 U.S. at 201. "This second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Samuelson</u>, 455 F.3d at 875 (quotation omitted). "It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." <u>Saucier</u>, 533 U.S. at 205. If Arnold made a reasonable mistake in supposing that his actions were legal, he is entitled to qualified immunity. <u>Id.</u>

We conclude that Arnold made a reasonable mistake as to the legality of his actions. First, because Kenneth initially desired to stay home with his son and because Arnold planned on arriving promptly, an officer in Arnold's position could have reasonably believed that his detention order would not effectively result in an appreciable curtailment of Kenneth's liberty. Second, as the defendants observe, the state has a strong interest in investigating child death cases. Third, Arnold testified that child deaths can be difficult to investigate and that it is important to interview the person who had cared for the child immediately before the incident. Finally, we note language in the case law suggesting that the reasonableness of police action in the Fourth Amendment context is to be assessed by weighing the magnitude of the intrusion against the importance of the government interests. <u>See, e.g.</u>, <u>Place</u>, 462 U.S. at 703 ( directing courts to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."). Given the foregoing considerations, we cannot say that an officer conducting a child death investigation who pursued a means of investigation that he thought would be fairly unintrusive and which he considered useful in the circumstances made an unreasonable mistake regarding the legality of his actions. Arnold and Danner were thus entitled to qualified immunity with respect to the detention order.

This does not end our inquiry, however, because even if the officers had made a reasonable mistake of law by concluding that they could lawfully detain Kenneth,

the Seymours also contend that a reasonable officer would understand that the detention was unreasonably long and was tantamount to a *de facto* arrest. In other words, we must undertake a qualified immunity analysis not just with respect to the fact of detention, but with respect to its quality and duration as well.

The police were required to act with diligence and to take reasonable steps to confirm or dispel their suspicions in a timely manner. See United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999) ("After making a valid *Terry* stop, police officers must diligently work to confirm or dispel their suspicions in a short period of time."). If we were evaluating this case from the perspective of "the 20/20 vision of hindsight," Graham v. Connor, 490 U.S. 386, 396 (1989), we might conclude that a reasonable officer would know that detaining Kenneth at home was not a reasonable means of quickly confirming or dispelling any suspicion that the officers may have had that Kenneth had harmed Nathaniel. The officers on the scene could have questioned Kenneth and then let him proceed to the hospital (accompanied, if necessary, by a police officer), subsequent to which Arnold and Danner could have interrogated him.[7] This would have been consistent with the procedures suggested by Arnold's training and would have enabled Kenneth to proceed forthwith to the hospital.

---

[7]The defendants, citing Arnold's testimony, note that there might be any number of justifications for detaining individuals in a child death investigation. Many of the justifications appear to be general in nature, however, and do not necessarily indicate that Kenneth should have been detained at home. Indeed, Arnold disclaimed as irrelevant one of the rationales proffered on appeal – the risk of flight. Many of the rationales proffered would appear to have been fully served by allowing Kenneth to go to the hospital in the company of an officer. Furthermore, Arnold testified that there was no reason why Kenneth would have been required to stay once family members had arrived to take care of the children, and indicated that he would have let Kenneth go to the hospital, probably accompanied by an officer, had Arnold been apprised of Kenneth's request.

In assessing Arnold's conduct, we must bear in mind that his actions are not to be viewed through the lens of judicial hindsight. Graham, 490 U.S. at 396. Moreover, "allegations of constitutional violations that require courts to balance competing interests may make it more difficult to find the law clearly established when assessing claims of qualified immunity." Walker v. City of Orem, 451 F.3d 1139, 1151 (10th Cir. 2006) (quotation omitted). As we noted earlier, Arnold believed that the intrusion upon Kenneth's interest in getting to the hospital would be minimal. Moreover, none of the officers at the scene had informed Arnold that Kenneth wanted to go to the hospital. We acknowledge that both Arnold and the officers on the scene could have done a better job of communicating with one another and of safeguarding Kenneth's rights. Even if Kenneth's detention was unduly prolonged, however, we cannot say that a reasonable officer in Arnold's position would have known that Kenneth's detention was too lengthy or intrusive to pass constitutional muster. For similar reasons, we conclude that, even if the seizure had objectively developed into a *de facto* arrest, a reasonable officer could have concluded that the seizure was investigative in nature.

2.     The City's Liability

The Seymours contend next that the City is liable for the violation of Kenneth's Fourth Amendment rights. We disagree. A municipality may not be held liable under section 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Social Services, 436 U.S. 658, 691(1978). A municipality will not be liable merely because it employed a tortfeasor. Id.

We recently addressed Monell liability in Szabla v. City of Brooklyn Park, 486 F.3d 385 (8th Cir. 2007) (en banc). In Szabla, we delineated two basic circumstances warranting Monell liability: 1) where "a particular municipal action *itself* violates federal law, or directs an employee to do so," Szabla, 486 F.3d at 389 (quoting Bd. of

the County Comm'rs v. Brown, 520 U.S. 397, 404-05 (1997) (emphasis in original)); and 2) where "a *facially lawful* municipal action has led an employee to violate a plaintiff's rights" and "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Id. at 390 (quoting Brown, 520 U.S. at 407 (emphasis supplied)).

With these two circumstances in mind, we conclude that Monell liability is not warranted in this case. First, we cannot say, on the basis of this record, that the procedures adopted by the City violate federal law or direct its employees to do so. The Seymours contend that the procedures adopted by the City require officers to detain individuals regardless of whether there is probable cause or reasonable suspicion to do so. We disagree. From Arnold's and Danner's testimony it is apparent that the City's child death investigation procedures are investigative techniques to be used where appropriate rather than commandments to be obeyed regardless of the circumstances. Arnold testified, for example, that because the Fox Valley training (from which the City's procedures are adopted) does not cover every situation an officer might face, officers must use judgment and common sense in dealing with situations not specifically addressed in the training. He also testified that it would not always be necessary to detain someone if there is no suspicion of a crime, thus indicating that officers are not directed by the procedures to detain individuals in every case. Moreover, Danner testified that "we gain our knowledge from those schools. And even that isn't policy. Those are just guidelines for us to use. Every investigation is different. You just can't go A, B, C." Thus, it appears that while the investigative techniques taught by Fox Valley and other schools are commonly employed, whether and how they are used in a particular case is a matter of discretion. Accordingly, we cannot say that any City policy affirmatively directs officers to violate constitutional rights. Cf. Dick v. Watonwan County, 738 F.2d 939, 942 (8th Cir. 1984) (holding that a policy that vested discretion in individual officials did not affirmatively sanction the constitutional violation at issue).

Nor can we discern any evidence that the City took a municipal action with "'deliberate indifference' as to its known or obvious consequences." Szabla, 486 F.3d at 390 (quoting Brown, 520 U.S. at 407). There is no evidence, for example, that the City failed to train its officers in the proper exercise of their discretion. See id. at 392-94 (describing the contours of "deliberate indifference" based upon failure to train). Neither Arnold nor Danner was asked questions in their depositions about the training that the City's officers receive on such topics as safeguarding constitutional rights in child death investigations or the circumstances in which it is appropriate to deviate from commonly used procedures. The Seymours' mere allegation of inadequate training will not give rise to a genuine dispute of material fact on the subject. See Robinette v. Jones, 476 F.3d 585, 591 (8th Cir. 2007) (holding that a mere assertion of inadequate training unsupported by evidence to that effect will not suffice to defeat summary judgment).

We need not speculate whether our conclusion might well have been different had there been evidence that the City's policies required officers to detain individuals in child death investigations without regard to the specific circumstances of the situation, or if there had been evidence that the City had not adequately trained officers to recognize the circumstances in which it would be appropriate to seize caregivers in such cases.

B.      The State Law Causes of Action

1.      The Seymours' Defamation Claim

The Seymours contend that Arnold and Danner made statements to Child Protective Services that defamed them. We disagree. The Seymours do not indicate what defamatory statements were made, and suggest only that Arnold requested an investigation. They make no citation to the record supporting this suggestion, and the

-15-

record indicates that he merely apprised Child Protective Services of the basic, uncontested facts surrounding Nathaniel's medical distress.[8]

## 2. The Other Claims

The Seymours argue that the district court erred by granting summary judgment on their other claims on grounds that were not raised by the defendant.[9] See Heisler v. Metro. Council, 339 F.3d 622, 631 (8th Cir. 2003) ("We have repeatedly held that in the Eighth Circuit, a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties."). The defendants do not argue that the district court's grant of summary judgment was procedurally proper or that it correctly analyzed the Seymours' claims. Instead, they argue that the district court can be affirmed on any ground supported by the record. They proffer on appeal the very same ground that they asserted in their motion for summary judgment which was rejected by the district court; namely, that they were entitled to emergency response immunity pursuant to Iowa Code § 670.4(11). After reviewing the parties' arguments, the district court's memorandum of law, and the Iowa Code, we conclude that the defendants were entitled to emergency response immunity under Iowa Code § 670.12 (which covers municipal employees) and § 670.4(11) (which encompasses municipality liability). Under Iowa law, municipalities will be exempt from liability on claims "based upon or arising out of an act or omission in connection with an emergency response." Iowa Code § 670.4(11). Municipal employees are likewise exempt from liability, "unless actual malice or willful, wanton and reckless misconduct is proven." § 670.12. Iowa courts have interpreted broadly the

---

[8]We have also considered the Seymours' contention that Arnold and Danner defamed Kenneth by implication and conclude that it lacks merit. It also bears mention that there is no indication that Danner made any defamatory statements.

[9]The remainder of the state law causes of action allege false imprisonment, assault and battery, defamation, intentional infliction of emotional distress, conspiracy, aiding and abetting, and loss of spousal consortium.

-16-

circumstances to which these immunities apply. <u>Cubit v. Mahaska County</u>, 677 N.W.2d 777, 784 (Iowa 2004). The Seymours contend that Arnold and Danner were not responding to Nathaniel's medical emergency, but were instead conducting a criminal investigation. In light of the broad construction accorded the immunity statutes, we do not believe that emergency response can be parsed so finely. The investigative response arose out of and was related to a medical emergency. In such situations, a response by the child abuse unit may result in the disclosure of medically helpful information. It will not do so in every case and did not do so here, but the purposes of emergency response immunity would be ill served if officers who are charged with quickly uncovering information related to a child's medical emergency were left to speculate whether their inquiries were sufficiently tied to a precise definition of emergency response. Although there may well be cases in which the link between law enforcement action and emergency response is sufficiently attenuated that immunity would not be appropriate, we conclude that immunity was appropriate here. As to the officers specifically, the undisputed evidence, viewed in the light most favorable to the Seymours, does not support the Seymours' contention that Arnold and Danner acted with malice or that their conduct was wilful, wanton, or reckless.

The judgment is affirmed.

JOHN R. GIBSON, Circuit Judge, dissenting in part.

I respectfully dissent.

While I agree with much of what the court says today, I cannot agree that the officers were entitled to qualified immunity with respect to the detention order, as I conclude that under the circumstances the officers made an unreasonable mistake regarding the legality of their actions.

_____

-17-