# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-2419

_____

Crysteal Davis; Damon Davis; Iisha Hillmon

*Plaintiffs - Appellees*

v.

Jeffrey Dawson; Brad Youngblut; Josh Rhamy

*Defendant*s

Trevor Spear; Ryan Neumann; Lucas Kramer

*Defendants - Appellants*

Ross Klein; Patrick Hickey

*Defendant*s

Robert Clock

*Defendant - Appellant*

Dana Wingert; City of Des Moines, Iowa; Steven McCarville

*Defendant*s

_____

Appeal from United States District Court
for the Southern District of Iowa - Central

_____

Before BENTON, SHEPHERD, and STRAS, Circuit Judges.
_____

BENTON, Circuit Judge.

Des Moines Police officers, lacking probable cause, took relatives of a stabbing victim to the station, holding them for over three hours despite their repeated requests to leave. Meanwhile, the victim died. The family sued. The district court[1] denied qualified immunity, ruling for the family on their claims of illegal seizure and false arrest. The officers appeal. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

On August 5, 2017, Shawn E. Davis stabbed Preston Davis outside a gathering at his home. Several people—including Crysteal Davis (the victim's wife), Damon Davis (his brother), and Iisha Hillmon (his cousin)—witnessed the stabbing. Police secured the scene, taking Shawn into custody. Paramedics took the victim to the hospital.

Des Moines Police Department officers Trevor Spear, Ryan Neumann, and Lucas Kramer responded to the scene. Captain Robert Clock was the Watch Commander in charge of the officers. All the witnesses, including the family, told the officers that Shawn stabbed the victim, and they wanted to go to the hospital.

_____

[1]Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

Crysteal and Damon tried to leave in their cars but the officers stopped them. At least three officers told the family they would take them to the hospital. They got in two patrol cars. Instead, the officers took them to the police station, where they waited more than three hours to be interviewed. Throughout the car ride and during their wait at the station, the family members demanded to go to the hospital.

In the patrol car, after being told they were going to the station to be interviewed instead of to the hospital, Crysteal repeatedly insisted that they needed to go to the hospital: "We have to go to the hospital, first . . . . If we're not going to the hospital right now, I'm having my dad call a lawyer, because my husband is in critical condition. We can do that at the hospital . . . . I would have never gotten in this car had I known they were taking me for questioning."

At the station Crysteal asked: "Are we like literally for real held captive? If we tried to walk out, would we be arrested?" An officer responded: "You guys are not free to leave. The detectives want to talk to you." Damon repeatedly asked if Crysteal could go see her husband. But the family members were detained for over three hours while Preston died.

Crysteal Davis, Damon Davis, and Iisha Hillmon sued Officers Trevor Spear, Ryan Neumann, Lucas Kramer, and Captain Robert Clock (and others not party to this appeal) for unreasonable seizure in violation of their civil rights under 42 U.S.C. § 1983, the related state constitutional claim under article I, section 8 of the Iowa Constitution, and common law false arrest.

The district court denied summary judgment based on qualified immunity.[2] The district court also entered judgment for the family members on their claims of illegal seizure and false arrest by Spear, Neumann, and Kramer.

---

[2]The district court denied qualified immunity to Clock based on a question of fact over whether he had a direct role.

-3-

This court has interlocutory jurisdiction over the denial of qualified immunity under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). This court reviews *de novo* the denial of qualified immunity. *Gladden v. Richbourg*, 759 F.3d 960, 964 (8th Cir. 2014).

II.

Officers are "entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to [the plaintiffs], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful." *Blazek v. City of Iowa City*, 761 F.3d 920, 922-23 (8th Cir. 2014), *citing Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A clearly established right is one that is "sufficiently clear 'that every reasonable official would have understood that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up), *quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

First, this court considers whether the officers violated the family members' constitutional rights. To establish a violation of the Fourth Amendment, "the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *Quraishi v. St. Charles County*, 986 F.3d 831, 839 (8th Cir. 2021).

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Officer Kramer told Crysteal and Damon they were going to the station, not the hospital, after they were in the "cage" in the back of the moving patrol car. Crysteal and Damon immediately and repeatedly objected to the changed plans. They asked to be taken to the hospital. As Officer Neumann escorted Iisha to the patrol car, he stated: "alright, we're going to the hospital, is that correct?"

-4-

Once she and the other passengers were seated in the car, he announced the change of plans: "I'm telling you where we're going, we're going to the station." "I know you don't wanna . . . that's where we're going." When Crysteal asked at the station if they were being "held captive," the officer responded: "you guys are not free to leave." The family members could reasonably assume they were not free to leave.

Unlike the witness in *Lincoln*, cited by the officers, the witnesses here clearly did not consent to being taken to the police station for questioning. *See **Lincoln v. Scott***, 887 F.3d 190, 198 n.5 (5th Cir. 2018) (affirming the grant of qualified immunity on second appeal because officers reasonably believed witness had consented to being detained and interviewed). Here, the family members repeatedly asked to be taken to the hospital. They expressly told Spear they could be interviewed at the hospital or at a later time. They provided contact information to the officers at the scene so they could be reached for an interview later. Crysteal informed the officers unambiguously: "I would have never gotten in this car had I known they were taking me for questioning." The officers seized the family members without consent.

The question is then whether the seizure was reasonable. The Supreme Court in *Dunaway v. New York* said that with a few narrow exceptions "centuries of precedent" support "the principle that seizures are 'reasonable' only if supported by probable cause." ***Dunaway v. New York***, 442 U.S. 200, 214 (1979).

The officers argue that their seizure of the family should be examined as a *Terry* stop. *See **Terry v. Ohio***, 392 U.S. 1, 21 (1968). *Terry* provides one narrow exception to the probable cause requirement of the Fourth Amendment. *See **Dunaway***, 442 U.S. at 208-14*.* But "[a]n action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." ***United States v. Rose***, 731 F.2d 1337, 1342 (8th Cir. 1984), *citing **Florida v. Royer***, 460 U.S. 491, 504-05 (1983). The Supreme Court has not extended *Terry* to custodial interrogations: "The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious

circumstances, but any further detention or search must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975).

Analyzing a seizure, this court "must undertake a qualified immunity analysis not just with respect to the fact of detention, but with respect to its quality and duration as well." *Seymour v. City of Des Moines*, 519 F.3d 790, 799-800 (8th Cir. 2008). In *Seymour*, Des Moines police detained a father, preventing him from going to the hospital for about 45 minutes after his unresponsive child was hospitalized. *Id.* at 795. This court determined the detention violated the father's constitutional right to be free from unreasonable seizures, because there was not reasonable suspicion he had committed a crime (but granted the officers qualified immunity on mistake-of-law grounds). *Id.* at 798. Here, all witnesses told the officers that Shawn Davis was the perpetrator; they had him in custody. Indeed, the officers admit there was no probable cause to believe the witnesses had committed a crime (acknowledging that "Appellees were being interviewed as solely witnesses to a homicide" and "never suspects.").

Here, there was no minimally-intrusive *Terry* stop. Both the duration and the nature of this seizure exceed the bounds of the Constitution. *Cf. Illinois v. Lidster*, 540 U.S. 419, 427 (2004) (finding constitutional a traffic checkpoint seeking information about a week-old, hit-and-run accident because motorists had to wait "a very few minutes at most" and "[c]ontact with the police lasted only a few seconds"). As this court determined in *Seymour*, even a 45-minute detention can be too long. *Seymour*, 519 F.3d at 795. These family members were taken to the station and detained for over three hours. This detention was a most intrusive means of questioning survivors after a violent crime: the officers transported the family to the police station, separated them, took away Iisha's phone, and expressly prevented her from telling Crysteal that her husband had died. *Dunaway* controls the intrusive seizure here.

-6-

Second, this court considers whether the constitutional right violated was clearly established. It is a "settled principle that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer." *Davis v. Mississippi*, 394 U.S. 721, 727 n.6 (1969). The Court in *Dunaway* held that "police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation." *Dunaway*, 442 U.S. at 216. The Court reasoned that "any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id.* at 213. *See also Royer*, 460 U.S. at 500 ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."). *See generally Henry v. United States*, 361 U.S. 98, 100-01 (1959) (describing how rebellion against oppressive "general warrants" and "writs of assistance" motivated the Fourth Amendment's probable cause requirement, which "has roots that are deep in our history.").

Officers of the Des Moines Police Department, in particular, were on notice that they could not detain someone for questioning against their will, even in a homicide investigation, absent probable cause. This court determined in *Seymour* that officers from that department violated a father's rights when they detained him without probable cause while investigating his young son's sudden hospitalization and death. *See Seymour*, 519 F.3d at 797-98.

The officers cite a district court case with similar facts to support that the law is not clearly defined. *See Magnan v. Doe*, 2012 WL 5247325, at *5 (D. Minn. 2012). In that case, the officers detained family members of an attempted-homicide victim at the crime scene despite their protestations that they needed to go to the hospital to be with him. *Id.* at *4. The district court, however, found that based on the circumstances the officers formed a reasonable suspicion that the family

members "were somehow involved with the homicides." **Id.** Here, by contrast, the officers denied having any such reasonable suspicion that the family was involved in the homicide. Further, the district court in *Magnan* denied qualified immunity as to the duration and conditions of detention once the scene was secure because it was not clear that detention in the squad cars was the "least intrusive means available." **Id.** at *8.

There is also a robust consensus that seizing witnesses to a crime in similar circumstances is a clearly established constitutional violation. *See, e.g.*, **Lincoln**, 887 F.3d at 198 n.5 (5th Cir. 2018) (reiterating that the right not to be seized and transported for interrogation is "clearly established" by *Davis v. Mississippi* and *Dunaway*, but distinguishing where plaintiff apparently consented to detention); **Maxwell v. County of San Diego**, 708 F.3d 1075, 1083 (9th Cir. 2013) (holding "officers were on notice that they could not detain, separate, and interrogate the [plaintiffs] for hours" just because they witnessed a shooting); **Bletz v. Gribble**, 641 F.3d 743, 756 (6th Cir. 2011) (holding "[l]aw enforcement officers were fairly on notice regarding the constitutional violations inherent in subjecting an innocent bystander to a detention that was excessive both in duration and in the manner it was carried out"); **State v. McCoy**, 692 N.W.2d 6, 19-20 (Iowa 2005) (holding defendant's counsel ineffective for not raising a "*Dunaway* violation" for illegal seizure when "police simply took the defendant to the station for investigative purposes, knowing full well they had no legal reason to detain him."). *Cf.* **Walker v. City of Orem**, 451 F.3d 1139, 1147 (10th Cir. 2006) (seizing and interrogating witnesses to a police shooting at the scene violated the Fourth Amendment, but prior to *Lidster* when the shooting occurred, it was not clearly established).

## III.

The officers claim that the district court should have granted "all-due-care immunity" on the state law claims against Spear, Neumann, and Kramer. "All-due-care immunity is a constitutional immunity that bars suit and damages only for constitutional claims and only when the government official proves 'that he or she

exercised all due care to conform with the requirements of the law.'" ***Venckus v. City of Iowa City***, 930 N.W.2d 792, 802 (Iowa 2019), *quoting* ***Baldwin v. City of Estherville***, 915 N.W.2d 259, 260-61 (Iowa 2018) ("***Baldwin I***").  Lack of due care is equivalent to negligence.  ***Baldwin I***, 915 N.W.2d at 280.

Iowa courts "generally 'interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment' because of their nearly identical language"—while reserving the right to apply the framework differently.  ***State v. Brown***, 930 N.W.2d 840, 847 (Iowa 2019), *quoting* ***State v. Christopher***, 757 N.W.2d 247, 249 (Iowa 2008).  The Iowa Supreme Court has endorsed the probable cause requirement for investigative detention, finding "no basis to distinguish the protections afforded by the Iowa Constitution from those afforded by the federal constitution."  ***McCoy***, 692 N.W.2d at 15.

The same evidence establishing the officers' violation of § 1983 and the Fourth Amendment establishes a violation of the Iowa Constitution.  The officers seized the family against their will and without probable cause.  There was no mistake of law here nor "reasonable ground" for the officers' action.  *See* ***Baldwin v. Estherville***, 333 F.Supp.3d 817, 846 (N.D. Iowa 2018).  In their motion for summary judgment, the officers assert only that "there is no evidence of a lack of due care to existing precedent."  They do not show any attempt to conform with the law.  All due care is an affirmative defense, and the officers do not carry their burden of showing due care to be entitled to the defense.

IV.

This court reviews an entry of judgment *de novo*.  ***United States ex rel. Glass v. Medtronic, Inc.***, 957 F.2d 605, 607 (8th Cir. 1992).

The district court granted partial summary judgment to the family on their common-law false arrest or false imprisonment claim.  The family argues that this

court does not have jurisdiction over the claim because a grant of partial summary judgment on liability is not a final judgment. *See Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 743-44 (1976). Generally, this court will only decide state law claims on interlocutory appeal if those claims are "inextricably intertwined with interlocutory appeals concerning the defense of qualified immunity." *Veneklase v. City of Fargo*, 78 F.3d 1264, 1269 (8th Cir. 1996). Where a claim is not "inextricably intertwined," this court only "review[s] state law claims on interlocutory appeal to determine if the district court properly denied a state entity or its agent immunity from suit." *Dillard v. O'Kelley*, 961 F.3d 1048, 1055 (8th Cir. 2020) (en banc), *cert. denied*, 141 S. Ct. 1071 (2021).

"An issue is 'inextricably intertwined' with properly presented issues only when the appellate resolution of the collateral appeal necessarily resolves the pendent claims as well." *Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1012 (8th Cir. 2003).

False arrest and false imprisonment are legally indistinguishable. *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984). Under Iowa law, a false arrest claim "has two elements: '(1) detention or restraint against one's will, and (2) unlawfulness of the detention or restraint.'" *Thomas v. Marion County*, 652 N.W.2d 183, 186 (Iowa 2002), *quoting Kraft*, 359 N.W.2d at 469. As discussed, the detention of the family here was unlawful.

In a civil suit for false arrest, "[i]f the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *Children v. Burton*, 331 N.W.2d 673, 680 (Iowa 1983). As discussed, the officers had no reasonable belief that the family committed a crime.

The officers took the family to the police station, where they did not agree to go, when they clearly wanted to go to the hospital. Officers then expressly prohibited them from leaving the station. The family members were unlawfully

-10-

detained against their will, and the resolution of the qualified immunity claims necessarily resolves the common-law false arrest claim as well.

\* \* \* \* \* \* \*

The order denying qualified immunity is affirmed, the partial summary judgment is affirmed, and the case remanded for further proceedings consistent with this opinion.

STRAS, Circuit Judge, concurring.

Rarely do rights come more clearly established. The Des Moines Police Department apparently thinks it is constitutional to seize, transport, and interrogate innocent witnesses based on "societal needs." Appellants' Br. 30. This type of "forcible and compulsory extortion of a [person's] own testimony"—frequently a feature of writs of assistance and general warrants—was repudiated by the Fourth Amendment. *Boyd v. United States*, 116 U.S. 616, 630 (1886); *see also Entick v. Carrington*, 19 How. St. Tr. 1029 (C.P. 1765). Like the court, I would reject the call to revive them, and I write separately to explain just how clearly established this right really is. *See* U.S. Const. amend. IV.

I.

"Government is instituted to protect property of every sort[,] as well that which lies in the various rights of individuals." James Madison, *Property*, Nat'l Gazette (Mar. 29, 1792); *see also* Alexander Hamilton, *Americanus No. II* (Feb. 7, 1794) (explaining that all "adequate" governments were "institut[ed]" for "the protection of persons and property"); Anti-Federalist No. 11 (Winthrop) (observing that "[c]ivil liberty consists in the consciousness of th[e] security" of one's "person[] and property"); Letter from James Otis, Samuel Adams, Thomas Cushing, and Thomas Gray to Dennys de Berdt (Dec. 20, 1765), *in* 1 The Writings Of Samuel Adams 61, 65 (Harry A. Cushing ed., 1904) ("The primary, absolute, natural Rights

of Englishmen . . . are *Personal Security*, *Personal Liberty*[,] *and Private Property*" and the "Colonists are intitled" to these rights "by [their] Charters, by Common Law[,] and by Acts of Parliament."). This basic principle, universally recognized at the time of the Founding, is why "'general warrants' and 'writs of assistance'" were so "reviled." *See Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Riley v. California,* 573 U.S. 373, 403 (2014)); *see also* Forrest McDonald, Novus Ordo Seclorum: The Intellectual Origins of the Constitution 1 (1985) ("Patriots were agreed that the proper ends of government were to protect people in their lives, liberty, and property and that these ends could best be obtained through a republican form.").

They were the historical equivalent of a "blank check." Starting out as a way of enforcing English smuggling laws, they initially allowed so-called "customs men" to search homes for stolen or smuggled imports. *See Carpenter*, 138 S. Ct. at 2239 n.6 (Thomas, J., dissenting) (observing that "'[w]rits of assistance' were 'general warrants' that gave customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws" (quotation marks omitted)); *see also* M.H. Smith, The Writs Of Assistance Case 17–19 (1978) (describing the origins of the writ of assistance). But they soon expanded to other situations and conferred breathtaking powers on the government officials who held them. Among their features were the authority to conduct indiscriminate searches of people and property, and in certain cases, conscript individuals to "'aid[] and assist[]' the Sheriff." Smith, *supra*, at 95 n.1 (quoting Commissions Issued by the Province of Pennsylvania 36 (W.H. Egle ed., 1896) (describing a "writ of assistance" that was common in colonial Pennsylvania)); *see also* James Otis, *Against Writs of Assistance* (Feb. 24, 1761) (observing that "a person with this writ . . . may enter all houses, shops, etc., at will, and command all to assist him"). They were premised on the notion that the Crown's interests stood above all others. *See* Smith, *supra*, at 426 ("[A]ll his Majesty's good Subjects are required to be aiding and assisting in the due Execution of said Writ or Warrant of Assistance." (citation omitted)).

The colonists resolved to stop these "unrestrained" practices. *Carpenter*, 138 S. Ct. at 2213 (quoting *Riley,* 573 U.S. at 403); *see also* Va. Declaration of Rights of 1776, art. X (observing "[t]hat general warrants" permitted "an officer or messenger . . . to search suspected places without evidence of a fact committed, or to seize any person . . . whose offence is not particularly described and supported by evidence"). In the years immediately preceding the Revolution, writs of assistance and general warrants were viewed as "instrument[s] of arbitrary power" that "destr[oyed] . . . English liberty." *Boyd*, 116 U.S. at 624–25 (citation omitted); Letter from John Adams to William Tudor (Mar. 29, 1817), *in* 10 The Works of John Adams 247–48 (Charles Francis Adams ed., 1856) (observing that "a crowded Audience" that was protesting the writs "appeared to me to go away, as I did, ready to take up arms against writs of assistance"); *see also* Otis, *supra*. Not to mention they made colonists "less secure," Smith, *supra*, at 562–63 (emphasis omitted), by "plac[ing] the liberty of every man in the hands of every petty officer," *Boyd*, 116 U.S. at 625 (quotation marks omitted); *see also* Otis, *supra* (stressing that "[e]very one with this writ may be a tyrant; if this commission be legal, a tyrant in a legal manner, also, may control, imprison, or murder any one within the realm"); Smith, *supra*, at 28 ("[T]here was a risk that an ostensibly lawful entry might in fact be a ruse for a burglary."). It is unsurprising that opposition to them became one of the organizing principles of the Revolution. *See* 6 Encyclopaedia of the Laws of England, *General Warrant*, 63 (A. Renton ed., 1898) ("The use of the writ of assistance was one of the causes of the revolt of the American colonies.").

## II.

Meanwhile, across the Atlantic, English courts issued a series of decisions that only sharpened colonial opposition. There were a number that had an impact, *see, e.g.*, *Wilkes v. Wood*, 19 How. St. Tr. 1153 (C.P. 1763); *Huckle v. Money*, 95 Eng. Rep. 768 (K.B. 1763); *Leach v. Money*, 19 How. St. Tr. 1001 (K.B. 1765), but perhaps none more so than Lord Camden's opinion in *Entick v. Carrington*, 19 How. St. Tr. 1029 (C.P. 1765). *See Boyd*, 116 U.S. at 626 (noting that the Founders

considered Lord Camden's opinion in *Entick* to be "the true and ultimate expression of constitutional law").

## A.

The warrant in *Entick* "act[ed] against every man, who [was] so described in the warrant, [even] though he be *innocent*." 19 How. St. Tr. at 1064 (emphasis added). The officers, who broke into Entick's home and seized his papers, defended their actions by arguing that this warrant, and others like them, were critical for "detecting offenders [and] discovering evidence." *Id*. at 1030, 1073.

This argument, echoed today by the Des Moines Police Department, was no more successful then. Lord Camden pointed out that general warrants arose "from a decree of the Star-Chamber," giving them less-than-noble origins, and then "crept into the law by imperceptible practice." *Id*. at 1067, 1069. No "authority in [the] book[s]," including the "written law," supported them. *Id.* at 1066, 1072. Nor could "such a power be justified by the common law." *Id*. at 1072. The warrant was, in Lord Camden's words, "illegal and void," and Entick had an action for trespass against the officers, who had invaded his right to be "secure [in his] property." *Id*. at 1066, 1074.

*Entick* was "welcomed and applauded by the lovers of liberty in the colonies." *Boyd*, 116 U.S. at 626 (chronicling its support). Many regarded Lord Camden's decision "as one of the permanent monuments of the British constitution." *Id*.

## B.

A Massachusetts case elicited a similar reaction. *See Paxton's Case* (Mass. 1761), *in* Josiah Quincy, Jr., Reports of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Massachusetts Bay, Between 1761 and 1772 480 (Little, Brown, & Co. 1865). In what later became known as *Paxton's Case*, a customs man applied to the Massachusetts Superior Court for a writ of assistance.

*Id.* at 479–480. Although there was never a formal decision, *id.* at 482, an oral pronouncement by Chief Justice Hutchinson questioned the "foundation for such a writ," 10 The Works of John Adams, *supra*, at 248, after attorney James Otis had challenged its legality, *see* Quincey, *supra*, at 471, 474 (chronicling the argument by James Otis that "[t]his Writ is against the fundamental Principles of Law" and "if an Act of Parliament should be made, in the very words of this Petition, it would be void"). According to John Adams, "Otis was a flame of fire" that spurred "the first scene[s] of the first act of opposition to the arbitrary claims of Great Britain," 10 The Works of John Adams, *supra*, at 247, that eventually "produced the American Revolution," Letter from John Adams to William Tudor (Dec. 18, 1816), *in* 10 The Works of John Adams, *supra*, at 233. *See* 10 The Works of John Adams, *supra*, at 248 (observing that "the child Independence was born" during James Otis's famous speech denouncing writs of assistance); *see also Davis v. United States*, 328 U.S. 582, 604 (1946) (Frankfurter, J., dissenting) (citing *Paxton's Case*).

A little more than a decade after *Entick* and *Paxton's Case*, the colonies "thr[e]w off the yoke of Parliament," "declare[d] general warrants unconstitutional in express terms," and "put an end . . . to general Writs of Assistance." Quincey, *supra*, at 540; *see also* 10 The Works of John Adams, *supra*, at 248 (observing that "fifteen years" after *Paxton's Case*, "the child Independence . . . grew up to manhood, and declared himself free"). In 1776, for example, Virginia ratified its Declaration of Rights, which stated that

> general warrants, whereby any officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offence is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted.

Va. Declaration of Rights of 1776, art. X. North Carolina, Maryland, Pennsylvania, and Massachusetts soon joined by passing similar provisions. *See* N.C. Const. of 1776, Declaration of Rights, art. XI (1776) ("That general warrants whereby an

-15-

Officer or Messenger may be commanded . . . to seize any person or persons not named whose offences are not particularly described and supported by evidence are dangerous to liberty and ought not to be granted."); Md. Const. of 1776, art. XXIII ("[A]ll general warrants—to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special—are illegal, and ought not to be granted."); Pa. Const. of 1776, Declaration of Rights, art. X (similar); Mass. Const. of 1780, pt. I, art. XIV (similar). In fact, ever since the break from Britain, "the protection against [unreasonable] governmental search and seizure" has been considered "[s]o basic to liberty" that "every State in the Union" has adopted "a constitutional safeguard" of this kind. *See Davis*, 328 U.S. at 604 (Frankfurter, J., dissenting).

## III.

The Framers eventually incorporated these state-level changes into the Fourth Amendment. U.S. Const. amend. IV. In the two centuries since, the Supreme Court has consistently recognized that Founding-Era "hostility" to general warrants and writs of assistance—paired with the "heralded [*Entick*] decision"—"inspired the Revolution and became 'the driving force behind the adoption of the Fourth Amendment.'" *Carpenter*, 138 S. Ct. at 2239 (Thomas J., dissenting) (brackets omitted) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 266 (1990)).

These principles have stuck. In one nineteenth century case, for example, the Supreme Court relied on "the language of Lord Camden" and described *Entick* as "expressing the true doctrine on the subject of searches and seizures." *Boyd*, 116 U.S. at 630. Nearly a century later, the Court announced that it was "settled" that "the police . . . have no right to compel [citizens] to answer" questions about "unsolved crimes," *Davis v. Mississippi*, 394 U.S. 721, 727 n.6 (1969), and that "[n]othing is more clear" than the fact that "the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions,'" *Dunaway v. New York*, 442 U.S. 200, 214–15 (1979) (quoting *Davis*, 394 U.S. at 726–27). And then,

roughly thirty years after *Dunaway*, we put those principles into practice by holding that a "detention violat[ed] [the] constitutional right to be free from unreasonable seizures," even though police tried to "justify" it "in terms of the state's interest in investigating a possible crime." *Seymour v. City of Des Moines*, 519 F.3d 790, 796, 798 (8th Cir. 2008).

\* \* \*

Some things never change. We once again reject the argument that investigatory need justifies suspicionless seizures. No Fourth Amendment principle is more clearly established.

_____